In re Charles S. GAGLIARDI, Gloria M. Gagliardi, Debtors.

No. 02–17985 EEB.

United States Bankruptcy Court, D. Colorado.

March 18, 2003.

Luis A. Lopez, Virginia H. Louden, Trinidad, CO, for debtors.

James H. Downey, Dan E. Miller, Englewood, CO, William G. Horlbeck, Denver, CO, for creditor.

## ORDER IMPOSING SANCTIONS FOR VIOLATION OF THE AUTOMATIC STAY

ELIZABETH E. BROWN, Bankruptcy Judge.

THIS MATTER came before the Court on the Debtor Charles S. Gagliardi's September 26, 2002 letter, alleging violations of the automatic stay by his mortgage holder, LaSalle Bank National Association ("LaSalle"), the loan servicer, EMC Mortgage Corporation ("EMC"), and their attorneys, Dan E. Miller ("Miller") and Downey, Miller & Hopp, LLC ("Downey Firm") (collectively, the "Respondents"). Following an evidentiary hearing on this matter, the Court finds that the Respondents' action in proceeding with an eviction, despite knowledge of the Debtors' bankruptcy, violated the automatic stay. The Respondents' conduct warrants the imposition of sanctions in the form of an award of attorney's fees and costs, as well as punitive damages.

### I. FACTUAL BACKGROUND

LaSalle was the beneficiary of two deeds of trust made by the Debtor, secured by adjacent homes, located at 515 and 517

Clark St., Trinidad, Colorado. LaSalle foreclosed its deed of trust on the 517 Clark St. property (the "Property") on April 24, 2002. As the successful bidder, LaSalle received a Public Trustee's Certificate of Purchase. In the absence of a bankruptcy filing, the Debtors' statutory redemption period of 75 days was due to expire on July 8, 2002. Prior to its expiration, on May 28, 2002, the Debtors filed a Chapter 7 petition. Pursuant to Section 108(b),[1] the bankruptcy filing extended the end of Debtor's redemption period sixty days after the entry of the order for relief, to July 29, 2002.

The Clerk of the Court served a Notice of Chapter 7 Bankruptcy Case, Meeting of Creditors, & Deadlines on all creditors of the Debtors on May 30, 2002. The record indicates that LaSalle was served through both EMC and James H. Downey, of the Downey Firm. Although these Respondents claim that they did not receive the Clerk's Notice, they have confirmed that the addresses used by the Clerk were accurate.

Carnis Jones, a bankruptcy paralegal from EMC, the loan servicer, testified that bankruptcy notices are typically received by EMC in one of three ways: either the debtor's attorney calls and the call is logged in the file, EMC receives notice directly from the court, or it receives notice from BANCO, an outside company with whom EMC contracts to search for bankruptcy filings. Once a bankruptcy filing is noted in a loan file, the loan shifts to the bankruptcy system and the file is referred to an outside attorney in the relevant state. Ms. Jones further testified that EMC utilizes a completely electronic system to track and maintain loan files and does not maintain paper files. BAN-CO performs daily bankruptcy filing searches and notes bankruptcy filings in EMC's electronic system. BANCO performs its daily bankruptcy searches and updates by social security number, but EMC's electronic system is set up according to property addresses. Ms. Jones' research revealed that a bankruptcy notice was received from BANCO in mid-June, 2002, and placed in the electronic file for the other home, 515 Clark St. The bankruptcy filing was only noted by EMC in its file for 515 Clark St. property. It was never listed in the electronic file for the subject Property.

Ms. Jones testified that EMC does not normally perform any manual cross-checks of its electronic files when a bankruptcy filing is loaded into the system, but that such is unnecessary because EMC customarily places flags or codes to indicate when there is more than one loan file for a particular debtor. In this instance, the flags or codes were not in place. She explained that EMC had acquired a servicing contract for over 70,000 loans in May 2002, which included these two loans of the Debtor, and EMC had simply not performed all of the standard safeguards due to this large influx of loans. If the flags had been created, they would have stopped all activity on both files until relief from stay had been obtained.

Miller and Mr. Downey both testified that it is their practice to track redemption periods and any bankruptcy filing by placing a notation on the cover of their file, when they receive notice of a bankruptcy filing. Since the Property's file listed only the original redemption expiration date of July 8, 2002 and did not contain any bankruptcy notation, they assert that they

---

**1.** All references to "Section" shall refer to Title 11, United States Code, unless expressly stated otherwise.

could not have received notice of the filing. In addition, the Downey Firm obtained an update of the foreclosure certificate from the title company, following the expiration of the original redemption period. This update, however, did not apprise them of the bankruptcy filing. This was the extent of the attorneys' due diligence. Apparently, neither attorney routinely conducts an electronic search for a bankruptcy filing on PACER before proceeding, despite its easy access, low cost and widespread use by practitioners in this district.

When EMC requested that the Downey Firm bring an eviction action on the Property, Miller contacted Mr. Winter, a real estate broker in Trinidad, Colorado, to find out whether the Property was occupied. Mr. Winter testified that, when he inspected the Property on July 10, 2002, the front door was open, but no one answered the door. As he turned to leave, the Debtor approached him from the 515 Clark St. property. The Debtor informed him that the Property was occupied by his mentally handicapped nephew and that he had not yet been able to find other living accommodations for him. Although the broker disputes this, the Debtor testified that he told Mr. Winter about his bankruptcy filing during this initial meeting. The Court found the Debtor to be more credible on this issue. Having come from his creditors' meeting that same day, the bankruptcy filing was clearly on the Debtor's mind.

After being informed that the Property was occupied, Miller prepared a Notice to Quit on July 11, 2002, which the Sheriff posted on the Property on July 18, 2002. LaSalle received its Public Trustee's Deed on July 22, 2002, which it recorded on July 23, 2002. On August 8, 2002, having been notified by Mr. Winter that the Property was still occupied, Miller filed a Summons and Complaint in Unlawful Detainer.

In their Response to the Order to Show Cause, the Respondents claimed that Miller had no notice of the bankruptcy until after the eviction had been completed. In fact, Miller stated that there was no mention of a bankruptcy filing at the eviction hearing itself. The transcript of the eviction hearing, however, contains the following exchange:

THE COURT: As I understand it, Mr. Gagliardi, you're not going to file an answer; is that right?

MR. GAGLIARDI: To the extent I filed bankruptcy on July 10, and primarily pretty much what I have right now.

MR. MILLER: I misunderstood what he said.

THE COURT: He said he filed bankruptcy on July 10.

MR. MILLER: Was the redemption period over at the time he filed bankruptcy?

THE COURT: I have no idea.

MR. MILLER: Because the redemption period was up on July 8. There's no extension of the redemption period under Section 108 of the bankruptcy code.

THE COURT: None of that is before me. This is an FED.

At the evidentiary hearing before this Court, after having received a copy of this transcript, Miller apologized to the Court for his faulty memory.

Despite his direct knowledge of a bankruptcy filing, obtained at least by the time of the eviction hearing, Miller continued to request a default judgment for possession at the eviction hearing. Having obtained a judgment, Miller then caused the eviction of the Debtor's nephew from the Property and changed the locks on September 24, 2002. Furthermore, it is undisputed that personal property belonging to both the Debtors and their nephew remained locked

in the home at least until the time of the hearing on this matter.

## II. VIOLATIONS OF THE AUTOMATIC STAY

■ The scope of the automatic stay is "undeniably broad."[2] It stays the "commencement or continuation ... or other action or proceeding against the debtor that was or could have been commenced before the [filing of the bankruptcy]," as well as the enforcement of a pre-petition judgment against the debtor or property of the estate.[3] The stay as to actions against a debtor continues until the case is closed, dismissed, or a discharge is granted or denied.[4]

■ It also stays actions to "obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."[5] The stay remains in effect until such property is no longer property of the estate.[6] "Property of the estate" is also very broadly defined to include all of the debtor's legal and equitable interests in property as of the commencement of the case, wherever located and by whomever held.[7] Whether a debtor has a legal or equitable

interest in property is determined by state law.[8]

■ The determination of whether the automatic stay applies to any given activity or property is to be made in the first instance by the bankruptcy court, not by a creditor or its attorney.[9] Actions taken in violation of the automatic stay are void and of no force or effect, even when there is no actual notice of the existence of the stay.[10] In addition, an "individual injured by any willful violation of a stay provided by this section *shall* recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages."[11]

■ In determining whether the Respondents violated the stay by proceeding with the eviction against the Debtors, the Court considers first whether the Debtors had any remaining interest in the Property on the date of their bankruptcy filing. Since the Property is located in Colorado, Colorado law governs this determination. Under Colorado law, title to real property on which a foreclosure sale has been conducted remains in the property owner until the expiration of the redemption period, at which time title automatically vests in the holder of the certificate of purchase.[12]

2. *Cuffee v. Atlantic Bus. & Cmty. Corp. (In re Atlantic Bus. & Cmty. Corp.)*, 901 F.2d 325, 327 (3d Cir.1990).

3. Section 362(a)(1) & (2).

4. Section 362(c)(2).

5. Section 362(a)(3).

6. Section 362(c)(1).

7. Section 541(a).

8. *See Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979); *In re Stoltz*, 197 F.3d 625, 630–31 (2d Cir.1999); *In re Stephens*, 221 B.R. 290 (Bankr.D.Me.1998).

9. *In re Diviney*, 225 B.R. 762, 768 (10th Cir. BAP 1998).

10. *In re Calder*, 907 F.2d 953, 956 (10th Cir. 1990); *Goichman v. Bloom (In re Bloom)*, 875 F.2d 224, 225 n. 3 (9th Cir.1989); *48th St. Steakhouse, Inc. v. Rockefeller Group, Inc. (In re 48th St. Steakhouse, Inc.)*, 835 F.2d 427, 431 (2d Cir.1987), *cert. denied*, 485 U.S. 1035, 108 S.Ct. 1596, 99 L.Ed.2d 910 (1988).

11. Section 362(h) (emphasis added).

12. C.R.S. § 38–38–501 states in relevant part: Upon the expiration of the period of redemption allowed to the owner ... title to the property sold shall vest in the holder of the certificate of purchase .... Within ten working days after the latest to occur of the expiration of all periods of redemption, the delivery of the certificate of purchase ... by the holder to the public trustee ..., and the

The owner has a right to redeem the foreclosed property within 75 days of the date of the foreclosure sale.[13] Following the expiration of the redemption period, the former owner retains a possessory interest, which is subject to defeasance. A former owner of property (or anyone claiming under him) is considered to be in unlawful detention of the property after a foreclosure action, only if he retains possession after title has vested and the new owner has duly demanded possession thereof.[14] The demand for possession is required to: (a) be in writing, (b) specify the grounds for the demand for possession and the time when possession must be delivered, (c) be signed by the person claiming possession, his agent or attorney,[15] and (d) be served by delivering a copy to the person occupying the property or by posting.[16] The service or posting of a demand for possession or notice to quit is a prerequisite to the filing of an eviction action.

■ At the time of the May 28, 2002 bankruptcy filing, the Debtors had three remaining property interests in the Property: (1) legal title; (2) a right of redemption; and (3) a legal right of possession. Even if the Debtors had not filed bankruptcy until July 10, 2002, as Mr. Gagliardi had mistakenly represented to Miller, he would nevertheless have retained his possessory interest, which by itself is an interest protected by the automatic stay.[17] As a result, the automatic stay prevented any commencement or continuation of an act against either the Debtors or the Property.

■ In this case, the following actions of the Respondents constituted violations of the stay: (1) the posting of the Notice to Quit; (2) commencement of the eviction action; and (3) the actual eviction of the Debtors. In addition, changing the locks on the Property, locking inside the Debtors' personal property (which is also property of the estate), without first obtaining relief from stay, was an act to exercise control over property of the estate in violation of Section 362(a)(3). This particular stay violation was a continuing violation, at least until the Respondents received an Order granting stay relief on January 21, 2003.

On the other hand, Respondents' request to the Public Trustee to issue a deed was not an additional violation of the automatic stay.[18] Pursuant to C.R.S. § 38–38–

receipt of all statutory fees, the public trustee ... shall execute and delivery a deed to the holder of the certificate of purchase ... confirming the transfer of title to the property. Failure of the trustee ... to execute and deliver such deed, or to deliver the deed within the time specified, shall not affect the validity of such deed or the vesting of title.

Under the terms of this statute, title to real property sold at a public trustee sale does not vest in the holder of the certificate of purchase or certificate of redemption until the expiration of the owner's and junior lien holder's redemption periods, at which time it vests automatically. *In re Thomas*, 87 B.R. 654, 656 (Bankr.D.Colo.1988). Prior to that time, title remains in the mortgagor and the certificate holder acquires only the alternative right to receive the redemption money or a deed after the time for redemption has expired. *Davis Mfg. & Supply Co. v. Coonskin Properties, Inc.*, 646 P.2d 940 (Colo.App.1982). *Accord, In re Case*, 91 B.R. 102 (Bankr.D.Colo. 1988).

13. C.R.S. § 38–38–302.

14. C.R.S. § 13–40–104(f).

15. C.R.S. § 13–40–106.

16. C.R.S. § 13–40–108.

17. *In re 48th St. Steakhouse, Inc.*, 835 F.2d at 430.

18. *See, e.g., In re Canney*, 284 F.3d 362, 375 (2d Cir.2002); *Fed. Land Bank v. Heiserman*

501, the vesting of title at the end of the redemption period is automatic and is not affected by the issuance (or lack of issuance) of a Public Trustee's Deed, which is merely a ministerial function confirming the vesting of title.[19] At the time the Public Trustee's Deed was issued and recorded in this case, however, the Debtors' extended redemption period had not expired and title to the Property had not yet vested in LaSalle. As a result, the July 22, 2002 deed is invalid.

Respondents contend that, if the filing date had been July 10, 2002, as Debtor represented, then their actions would not have violated the stay because the Debtors no longer held any property interest protected by the stay, relying on *In re St. Clair.*[20] In *St. Clair,* the debtors filed their bankruptcy after both the purchaser at the foreclosure sale had obtained its deed, and the debtors had been served with a writ of possession. Under New Jersey law, once a writ of possession issues following a foreclosure sale, the former owner has no further right of possession. Under these facts, the *St. Clair* court held that the automatic stay did not protect the debtors' possessory interest.

The Respondents' reliance on *St. Clair* was ill advised for four reasons. First, the instant case is factually distinguishable from *St. Clair.* Given the actual filing date of May 28, 2002, the Debtors' right of redemption had not yet ended and, thus, the purchaser's deed should not have been issued, nor was there a right to terminate the Debtors' possessory interest. Even if the filing date had been July 10, 2002, as

the Debtor mistakenly represented, the Debtors would have held a right of possession on this later date. Since Colorado law requires a proper written demand to be either served or posted before the former owner's right to possession terminates, and that had not occurred in this case until July 18, 2002, the right of possession had not been lawfully terminated before the supposed July 10, 2002 bankruptcy filing date. In contrast, a state court had already terminated the *St. Clair* debtors' possessory interest, prior to their bankruptcy filing.

Second, the *St. Clair* court found that, under New Jersey law, a foreclosure action or the enforcement of a foreclosure judgment was a quasi-in-rem action, affording relief only against the secured property. Accordingly, it reasoned that an action to enforce a writ of possession would be an act to enforce a judgment only against the property, not the debtor, and, therefore, it would not violate Section 362(a)(1) or (2)'s prohibition against actions against the debtor. In Colorado, we have no statutory or case law authority declaring eviction proceedings to be "in rem" only. In other Colorado statutes, the legislature has expressly described the relief provided for in the statute as "in rem." [21] Colorado's eviction statute does not contain this characterization.

Third, the *St. Clair* court itself recognized a split of authority as to whether mere possession, without any accompanying legal interest, is sufficient to trigger Section 362(a)(3)'s protection of property

*(In re Heiserman),* 78 B.R. 899, 902 (Bankr. C.D.Ill.1987).

**19.** *In re Thomas,* 87 B.R. at 656.

**20.** *In re St. Clair,* 251 B.R. 660 (D.N.J.2000), *aff'd,* 281 F.3d 224 (3d Cir.2001).

**21.** *See, e.g.,* C.R.S. § 38–22–113(3) ("Proceedings to foreclose and enforce mechanics' liens under this article are actions in rem ...."); C.R.S. § 31–25–1104 ("[T]he taxing authority may institute a proceeding in the nature of an action in rem ....").

interests.[22] There is no controlling precedent in this jurisdiction which follows *St. Clair's* holding that, without a colorable legal claim to possession, the stay is not applicable. In the absence of clear precedent, the Respondent attorneys should have obtained a court ruling on the stay's application before proceeding with the eviction.

Fourth, the Respondents have interpreted the holding of *St. Clair* too broadly. In analyzing whether the possessory interest held by the debtors was a sufficient property interest to invoke the stay's protections under Section 362(a)(3), the *St. Clair* court found that, in a case where the possessory interest is legally terminated prior to the bankruptcy filing, there is no violation of Section 362(a)(3) when the purchaser proceeds with an eviction. The court reasoned that, since the debtors did not have any good faith, colorable right to continued possession, an eviction would not implicate any property "of the estate," nor would it constitute an act to obtain possession of property "from the estate."

The *St. Clair* court's ruling appears, at first blush, to contradict controlling precedent in its own jurisdiction. The Third Circuit had previously held in *In re Atlantic Business & Community Corp.*, that "mere possession of property at the time of filing is sufficient to invoke the protections of the automatic stay." [23] The procedural contexts of the two cases, however, were very dissimilar. In *Atlantic*, the debtor sought sanctions against the landlord who had demanded immediate possession from the debtor and then changed the locks, despite his knowledge of the company's bankruptcy. The landlord made no

attempt to seek stay relief before proceeding to terminate the debtor's status as a tenant at sufferance. In this context, the Third Circuit affirmed the award of actual and punitive damages against the landlord. In *St. Clair*, the purchaser of the property sought stay relief immediately after the bankruptcy filing. The issue centered around whether the bankruptcy court's order could grant prospective relief from stay in the event that the debtors dismissed their Chapter 13 case and re-filed. Before the bankruptcy, the *St. Clair* debtors had been extremely litigious in state court, attempting to delay the inevitable loss of their home. Thus, the *St. Clair* creditor was not circumventing the need to obtain a court ruling as to the propriety of its actions in light of the automatic stay. It only sought a ruling that would prevent further abuse of process by the debtors, who had already had their day in both bankruptcy and state court to determine their right to possession. The Third Circuit affirmed *St. Clair*, without issuing an opinion. Does the fact that the Third Circuit affirmed *St. Clair* indicate that it had reconsidered its prior *Atlantic* holding that the stay is broad enough to encompass a mere possessory interest? Or was the Third Circuit's holding limited to *St. Clair's* procedural context?

In any event, the Respondents are accurate in pointing out that the *St. Clair* court made broad statements to the effect that, when a debtor has no colorable claim to a continued right of possession, whether because the tenancy has been legally terminated pre-bankruptcy, or because the debtor is a trespasser who never had a legal right or permission to enter upon the land, then the automatic stay does not

---

**22.** *In re St. Clair,* 251 B.R. at 667 n. 5. *See also Cuffee v. Atlantic Bus. & Cmty. Corp. (In re Atlantic Bus. & Cmty. Corp.),* 901 F.2d 325, 328 (3d Cir.1990) (holding that mere posses-

sion is protected); *In re 48th St. Steakhouse, Inc.,* 835 F.2d at 430 (same).

**23.** *In re Atlantic Bus. & Cmty. Corp.,* 901 F.2d at 328.

apply. A colorable claim, like beauty, however, is in the eye of the beholder. What if the alleged trespasser had a colorable claim of adverse possession or a valid claim that the process to terminate a tenancy was flawed? Should the creditor be allowed to make the determination as to the debtor's, and the estate's, right to possession in the first instance? The impact of allowing creditors to make their own interpretation of the stay's application can be seen in the instant case, where a creditor made a faulty assumption that the stay did not apply, based on a mistaken belief in the facts and the proper application of the law to those facts. If the Respondents had sought stay relief before evicting the Debtors, they would have discovered that the Debtors still held the right to legal title to the Property, during the extended redemption period, let alone the right to continue in possession of it. This Court does not interpret *St. Clair* as giving creditors license to usurp the court's role in determining a debtor's rights. The *St. Clair* decision centered around the fact that the creditor had already obtained a final ruling in state court that the debtors had no colorable claim to possession.

■ In addition to their reliance on *St. Clair*, the Respondents argue that the Property was no longer property of the estate because the Chapter 7 trustee had already filed her "No Asset Report" in this case, from which creditors could infer that she had no intent to redeem the Property. Her report was filed on July 12, 2002, before the Respondents took any action subsequent to the bankruptcy filing. The trustee's report, however, is of no legal consequence. Trustees routinely withdraw these reports when they subsequently discover assets worth administering. The Bankruptcy Code allows trustees to change their minds. Property which be-

comes part of the estate in a bankruptcy case remains property of the estate until it is abandoned. Section 554 provides the exclusive means by which property is abandoned. Property of the estate is only deemed abandoned after: (1) an abandonment order enters, following a motion to abandon that is properly served on creditors and other interested parties; or (b) if the asset is listed in the debtor's schedules, but is not otherwise administered by the trustee, then it is deemed abandoned at the time of the closing of the case. In this case, no party had filed a motion to abandon the Property and this case has not yet been closed.

■ A creditor and its agents act at their own peril when they usurp the bankruptcy court's role in determining the scope of the automatic stay, without binding authority that is clearly applicable to the facts at hand. Filing a stay relief motion is an inexpensive form of insurance against a stay violation award.

## III. DAMAGES FOR VIOLATION OF THE AUTOMATIC STAY

### A. *Actual Damages*

■ In order to impose sanctions against the Respondents for their violations of the stay, the Court must first find that their actions were "willful." [24] In order for a violation to be "willful," evidence of specific intent to violate the stay is not required. Violations are "willful" if the party knew of the automatic stay and intended to take the actions that violated the stay. A party's good faith belief that it has a right to the property is not relevant to a determination of whether the act was "willful" or whether compensation must be

---

24. Section 362(h).

awarded.[25] Even an innocent stay violation (one committed without knowledge of the stay) becomes willful, if the creditor fails to remedy the violation after receiving notice of the stay.[26] In effect, the term "willful" refers to the deliberateness of the conduct, coupled with knowledge of the filing. It does not require an intent to violate a court order. Once a court finds a violation of the stay to be willful, Section 362(h) makes the award of damages for injuries mandatory.[27]

■ Although all of the Respondents deny having received notice of the bankruptcy filing, it is clear that they had notice of this bankruptcy case through at least one of several means. The Court mailed notice of the filing to both EMC and Mr. Downey at valid addresses shortly after the case was filed. BANCO, EMC's outside bankruptcy service, noted the filing in the Debtor's other electronic loan file. Mr. Winter, the broker and Respondents' agent, was informed of the bankruptcy filing by the Debtor. Finally, Miller was informed of the bankruptcy during the hearing in the eviction action. Despite their actual knowledge of the bankruptcy filing through one or more of these means, the Respondents did not reverse their actions and restore the status quo, as they were required to do.[28] Instead they proceeded with the eviction, removing the Debtor's nephew from the Property and locking property of the estate inside. Accordingly, the Court finds that Respondents' actions were willful, entitling Debtors to recover damages.

■ The Debtors bear the burden of proving actual damages with reasonable certainty.[29] Although Mr. Gagliardi testified that he suffered apprehension and fear whenever he saw the realtor and that he had lost weight and sleep due to stress, he did not present any evidence of medical injury or otherwise quantify these injuries. Fleeting and unsubstantiated emotional distress is not compensable. The only actual damages in this case, which are definite and clearly attributable to Respondents' willful violations, are the Debtors' attorneys' fees and costs incurred when

**25.** *In re Diviney*, 225 B.R. 762, 774 (10th Cir. BAP 1998). *See also, Goichman v. Bloom (In re Bloom)*, 875 F.2d 224, 227 (9th Cir.1989); *In re Crysen/Montenay Energy Co.*, 902 F.2d 1098 (2d Cir.1990); *In re Atlantic Bus. and Cmty. Corp.*, 901 F.2d at 329; *Budget Serv. Co. v. Better Homes of Virginia, Inc.*, 804 F.2d 289, 290 (4th Cir.1986). *Jardine's Prof'l Collision Repair, Inc. v. Gamble*, 232 B.R. 799 (D.Utah 1999), cited by the Respondents, applies a narrower definition of willful (requires a deliberate and intentional violation of the stay) based in part on a Supreme Court case in the context of a Section 523(a)(6) objection to dischargeability of a debt, construing the word "willful" as modifying the word "injury." This construction is inconsistent with the fact that objections to dischargeability are narrowly construed because discharge is favored, while the automatic stay is a fundamental protection given to the debtor designed to stop all activity by creditors against the debtor or property of the estate during the pendency of a case, unless and until modified by court order.

**26.** *In re Diviney*, 225 B.R. at 776; *In re Carrigg*, 216 B.R. 303, 304–5 (1st Cir. BAP 1998); *Taborski v. United States*, 141 B.R. 959, 966 (N.D.Ill.1992); *In re Abrams*, 127 B.R. 239, 241–44 (9th Cir. BAP 1991).

**27.** *In re Mullarkey*, 81 B.R. 280, 284 (Bankr. D.N.J.1987); *Tel–A–Communications Consultants v. Auto–Use (In re Tel–A–Communications Consultants, Inc.)*, 50 B.R. 250 (Bankr. D.Conn.1985).

**28.** *See, e.g., Stansbury v. Chester Housing Authority (In re Stansbury)*, 1990 WL 59180 (Bankr.E.D.Pa.1990); *In re Lowry*, 25 B.R. 52, 56 (Bankr.E.D.Mo.1982).

**29.** *Doe v. United States*, 976 F.2d 1071, 1085 (7th Cir.1992); *Matter of Nat'l Marine Sales & Leasing, Inc.*, 79 B.R. 442 (Bankr.W.D.Mo. 1987).

they had to resort to court intervention to enforce their rights. Respondents argue that attorneys' fees may not be awarded, without proof of other compensable damages.[30] Section 362(h) states, however, that an individual injured by any willful violation of the automatic stay "shall recover actual damages, *including costs and attorneys' fees.*"[31] The use of "including" indicates that Congress considered fees as an example of actual damages by itself. Thus, Respondents' argument is contrary to the express language of the statute.[32]

■ Debtors' counsel filed a Bill of Costs, asserting attorneys' fees and costs incurred in prosecuting this matter of $4,852.60. The billing statement contains detailed time and expense entries. Counsel's hourly rate of $150.00, is commensurate with or lower than, the hourly rates typically charged by other professionals practicing before this Court. The Court reduces the amount sought by $900, however, allowing only one half of the amount billed by counsel for travel time and disallowing two hours of research, which resulted in counsel's citation of superceded case law. Consequently, the Court finds that the Debtors are entitled to an award of actual damages, based on reasonable costs and attorney's fees, of $3,952.60.

## B. *Punitive Damages*

■ In order for punitive damages to be awarded under Section 362(h), the Respondents must have acted with actual knowledge that they were violating a federally protected right or with reckless disregard of whether they were doing so.[33] The primary purposes of an award of punitive damages are punishment and deterrence. The five primary factors to be considered in determining whether to award punitive damages include: the nature of the creditor's conduct; the creditor's ability to pay damages; the level of sophistication of the creditor; the creditor's motives; and any provocation by the debtor.[34]

### 1. *Nature of the Creditor's Conduct*

Although the Debtor claims that he felt threatened and intimidated, there was no evidence of any threats or menacing or violent actions on the part of the Respondents or their agents. On the other hand, the Court finds that both Respondent Miller, individually and as an agent of the Downey Firm, and Respondent EMC have demonstrated a reckless disregard for whether they were acting in violation of the automatic stay. In order to deter future misconduct, the Court finds that it is appropriate to award punitive damages.

One could argue for lenient treatment of Miller and the Downey Firm on the basis that the Debtor told Miller that his bankruptcy filing occurred on July 10, instead of May 28. It was not Miller's place, however, to then determine whether the stay applied if in fact the redemption period had expired prepetition. In addition, counsel had a higher duty of inquiry when dealing with a *pro se* debtor. The Debtor

---

30. Respondents rely on *In re Whitt,* 79 B.R. 611 (Bankr.E.D.Pa.1987) and *In re Still,* 117 B.R. 251 (Bankr.E.D.Tex.1990).

31. Section 362(h) (emphasis added).

32. *See, e.g., In re Robinson,* 228 B.R. 75, 85 (Bankr.E.D.N.Y.1998). *Accord, In re Shade,* 261 B.R. 213, 217 (Bankr.C.D.Ill.2001); *In re Klein,* 226 B.R. 542 (Bankr.D.N.J.1998).

33. *In re Diviney,* 225 B.R. at 776.

34. *Id.* at 777. *Accord, In re Shade,* 261 B.R. at 216; *In re Klein,* 226 B.R. 542 (Bankr. D.N.J.1998) (which included the nature and extent of the harm to the debtor as an additional factor).

explained at the hearing that he was confused as to his filing date because he thought the date of the creditors' meeting on July 10 constituted his official filing date. Once Miller heard that the Debtor had filed for bankruptcy, he could have and should have asked the state court to hold the matter in abeyance, while he ascertained the truth of the Debtors' filing and then obtained stay relief.

EMC is also culpable. It received notice from the Court and from BANCO, but neither notice made its way into the electronic file on this Property. While it might appear to be an innocent mistake, the truth is that this servicing company knew it had not placed sufficient safeguards into its system as to its acquisition of 70,000 new loans. Even though it could not assimilate this many loans this quickly, without compromising its safeguards, it chose to take the loan portfolio anyway. Apparently, the economic benefit to EMC from acquiring this portfolio was sufficient that it was willing to risk this type of exposure. It can now suffer the consequences of that decision.

### 2. *Creditor's Ability to Pay*

The Debtors did not introduce any evidence regarding the ability of EMC and/or Miller and the Downey Firm to pay sanctions. Nevertheless, the national scope of EMC's business and the fact that Miller and the Downey Firm have a regular practice in the foreclosure and bankruptcy fields indicate that they are capable of paying an award of $5,000 each. If there had been evidence of their financial net worth, it is quite possible that a greater award should have been made in order to serve as a sufficient deterrent.

### 3. *Sophistication of the Creditor*

EMC is a sophisticated lender, which is evidenced in part by the sophisticated electronic system that it has adopted for processing its loan portfolio. It has also contracted with sophisticated third-party vendors to assist it in tracking bankruptcy filings, such as BANCO. Miller and Downey both testified that they have over forty years of combined bankruptcy experience between them.

### 4. *Creditor's Motives*

Neither EMC nor Miller acted out of a desire to exact revenge on the Debtor for filing bankruptcy or some other improper motive. Their actions reflect, however, a desire to pursue their economic objectives without being hampered by compliance with Section 362's requirements. EMC placed corporate profit over these requirements when it acquired 70,000 loans, without placing adequate safeguards in place. Miller placed his agenda to acquire possession expeditiously over the rights of the Debtors, when he did not even bother to confirm the Debtors' filing date, and when he usurped this Court's role in determining whether the stay applied.

### 5. *Provocation by the Debtor*

Respondents argue that in equity they should not be subject to sanctions for violation of the stay because they were without actual knowledge of the date of the petition and Mr. Gagliardi's unreasonable behavior contributed to the creditor's plight. Respondents rely on *In re Calder*,[35] in support of their position. *Calder* presents a very different circumstance than the present case. Calder was himself an experienced bankruptcy practitioner, who actively litigated the state court case and did not provide notice of his pending

---

**35.** *In re Calder,* 907 F.2d 953 (10th Cir.1990).

Chapter 13 proceeding, until immediately prior to the entry of a final judgment, claiming that he "forgot" to mention it. The Tenth Circuit held that, under these circumstances, it would be inequitable to allow Calder to claim the protection of the automatic stay to void the state court judgment. In the present case, the Respondents were provided with actual notice of the bankruptcy filing in several different ways, and they either failed or refused to make note of it. There was no evidence to indicate that Mr. Gagliardi intentionally misled them or that he was abusive of the Respondents or the bankruptcy process in a way that provoked their actions.

### 6. *Amount of Punitive Damage Award*

In determining the appropriate amount of punitive damages, the Court must consider the nature of the Respondents' conduct, the ability to pay, and the amount of actual damages awarded. The amount of punitive damages should be sufficient to deter the Respondents, and similarly situated parties in the future, from unilaterally determining the scope and effect of the automatic stay.[36] Courts have approved a wide range of punitive damages for violations of the automatic stay.[37] Given the number and character of the stay violations, the Court finds that an award of punitive damages in the amount of $10,000 is appropriate. Of that amount, EMC, a large company with significant resources, is ordered to pay $5,000. The Court believes that any lesser amount would not accomplish the necessary deterrence. Miller and the Downey Firm, who continue to insist that they can unilaterally determine whether the automatic stay applies, are ordered to pay the balance of $5,000.

## IV. CONCLUSION

Accordingly, it is hereby ORDERED that:

1. The July 22, 2002 Public Trustee's Deed issued to LaSalle, the July 11, 2002 Notice to Quit, and the September 24, 2002 eviction are NULL and VOID;

2. Debtors are hereby awarded actual damages against Respondents, jointly and severally, in the amount of $3,952.60; and

3. Debtors are hereby awarded punitive damages in the amount of: (i) $5,000 against EMC, and (ii) $5,000 against Miller and the Downey Firm, jointly and severally.

---

**36.** *In re Diviney*, 225 B.R. at 777.

**37.** *See, e.g., In re Diviney*, 225 B.R. at 778 (affirming a punitive damages award of $40,000); *In re Sumpter*, 171 B.R. 835, 845 (Bankr.N.D.Ill.1994) (awarding punitive damages equal to compensatory damages, noting that the creditor was probably facing financial problems of its own); *In re Shade*, 261 B.R. at 216–17 (awarding punitive damages of $9,000); *In re Lile*, 103 B.R. 830 (Bankr. S.D.Tex.1989), *aff'd*, 161 B.R. 788 (S.D.Tex. 1993), *aff'd in part*, 43 F.3d 668 (5th Cir.1994) (awarding punitive damages of $100,000).