**In re Patrick Joseph SULLIVAN and Candice Marie Sullivan, Debtors.**

No. 06–10015–SBB.

United States Bankruptcy Court, D. Colorado.

Nov. 15, 2006.

Stephen Berken, Denver, CO, for Debtors.

Douglas W. Brown, Denver, CO, for Wells Fargo Bank, N.A.

## MEMORANDUM OPINION AND ORDER DENYING DEBTORS' "MOTION FOR ORDER TO SHOW CAUSE WHY WELLS FARGO BANK SHOULD NOT BE HELD IN CONTEMPT"

SIDNEY B. BROOKS, Bankruptcy Judge.

THIS MATTER comes before the Court on the Debtors' Motion for Order to Show Cause Why Wells Fargo Bank Should Not Be Held in Contempt filed on March 16,

2006 (Docket # 19) ("Motion to Show Cause") and Wells Fargo Bank, N.A.'s ("Wells Fargo Bank") Response thereto filed on April 7, 2006 (Docket # 22). The Court having conducted a trial on the matter on June 8, 2006, and, as continued to June 14, 2006, having reviewed the pleadings in the within case file, and having heard the testimony of Debtor Candice Sullivan ("Ms.Sullivan"), Wells Fargo Bank employee Justin Velky ("Mr.Velky"), and the arguments of counsel, makes the following findings of fact, conclusions of law, and enters the following Order.

For the reasons stated herein, Debtors' Motion to Show Cause shall be DENIED.

## I. Background and Summary of the Case

On January 3, 2006, Debtors filed for relief under Chapter 13 of the United States Bankruptcy Code, at which time they also filed a Chapter 13 Plan. The Plan was subsequently amended. The Amended Plan ("Plan") was confirmed by this Court on April 21, 2006. The Plan provided that the Debtors were to pay $13,180.15 in prepetition arrears to Wells Fargo Bank through the Plan. In addition, Debtor's Plan provided that it would pay Wells Fargo Bank its regular postpetition mortgage payments of $1,500 per month directly. Upon notice of Debtors' Chapter 13 petition Wells Fargo Bank filed a Proof of Claim ("Proof of Claim") and no subsequent mortgage statements were sent to the Debtors pursuant to internal policies of the company.

Debtors were unsure of where/how to remit payment of their postpetition mortgage payments. Eventually, Ms. Sullivan was provided a phone number for Wells Fargo Bank's bankruptcy department, which she contacted on February 24, 2006. During the February 24, 2006 telephone call, the Wells Fargo Bank representative speaking with Ms. Sullivan incorrectly informed her that she was required to pay $13,810.15 in pre arrearages in order to bring her account current. Evidently, it was represented to her that this was required before any further payments would be applied to the *postpetition* mortgage. Ms. Sullivan questioned this statement based on her understanding of the Debtors' confirmed Plan. The Wells Fargo Bank representative accepted a payment over the phone from Ms. Sullivan in the amount of $3,810.14 during the course of the February 24, 2006 telephone call. Ms. Sullivan believed these amounts would be applied to her February and March 2006 postpetition payments. Wells Fargo Bank, however, applied the February 24, 2006 payment to the Debtors' postpetition January and February 2006 payments. This contributed to Debtors falling behind in their postpetition mortgage payments.

Believing Debtors were current in their postpetition mortgage payments but still uncertain where to remit payments, Ms. Sullivan attempted to send Debtors' April 2006 postpetition mortgage payment to her original lender, *Wells Fargo Home Mortgage.*[1] This payment was never received

---

1. The number of related entities utilizing "Wells Fargo" in their name is extensive and confusing and it does not seem at all unreasonable that Debtors were confused as to where to tender their postpetition mortgage payments. In fact, in preparing this opinion the Court itself has struggled with sorting out the various entities and properly identifying the same so as to properly convey the factual history of this case.

The Wells Fargo entities addressed herein include (perhaps, among others): Wells Fargo Bank, N.A., Wells Fargo Home Mortgage, Wells Fargo Operation Center, and certain Wells Fargo Bank branch offices. In an attempt to sort these entities out for the purpose of this opinion, the Court refers to Wells Fargo Bank, N.A. as Wells Fargo, and Wells Fargo Home Mortgage, Wells Fargo Opera-

nor was the check cashed. Ms. Sullivan personally tendered her next payment in May 2006 directly to *Wells Fargo Bank branch office* in Silverthorne, Colorado, after consultation with Debtors' attorney. The branch office accepted the payment, which was applied to Debtors' March 2006 postpetition mortgage payment. The confusion and uncertainty as to where and how Debtors were to remit postpetition mortgage payments was resolved shortly before the June 8, 2006 hearing in this matter and Debtors were current with their postpetition mortgage payments as of the hearing for the within hearing.

On March 16, 2006, the Debtors filed their Motion to Show Cause asserting that the statements by the representative of Wells Fargo Bank, informing the Debtors that their payment could not be applied to their postpetition mortgage until the account was brought current, violated the automatic stay pursuant to 11 U.S.C. 362(k)(1).[2] Debtors request the Court award them actual damages, costs and attorney's fees, and punitive damages for Wells Fargo Bank's alleged "willful" violation of the automatic stay.

Wells Fargo Bank counters that it goes to great lengths to avoid violations of the automatic stay and that the statements made by the Wells Fargo Bank representatives to Ms. Sullivan did not rise to the level of a "willful" violation. Wells Fargo Bank also argues that even if the statements of its representatives rose to the level of a "willful" violation for purposes of the statute, Debtors could show no damages. As to the failure to provide postpetition mortgage statements, Wells Fargo Bank argued they do provide these statements but only upon the written request of a debtor to avoid potential violations of the automatic stay.

## II. *Issues*

1. Does the incorrect information relayed to Debtors by a Wells Fargo Bank employee on February 24, 2006 constitute a "willful" violation of the automatic stay pursuant to 11 U.S.C. § 362(k)(1)?[3]

2. If the conduct of the Wells Fargo Bank representative constitutes a "willful" violation of the automatic stay, is an award of damages (including punitive damages) warranted?

## III. *Findings of Fact*

1. On October 17, 2003, the Debtors entered into an Equity Line with FlexAbility Agreement with Wells Fargo Bank

---

tion Center, and Wells Fargo bank branch offices will be italicized. Despite sharing similar designations, they all appear to operate—either intentionally or by inadvertently by operation—independently. Each having different policies and procedures.

2. 11 U.S.C. 362(k) reads:
(1) Except as provided in paragraph (2), an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages.
(2) If such violation is based on an action taken by an entity in the good faith belief that subsection (h) applies to the debtor, the recovery under paragraph (1) of this sub-

section against such entity shall be limited to actual damages.

3. Debtors also developed another theory argued in their later Support Brief filed June 14, 2006 (Docket # 42) and in their Proposed Findings of Fact and Conclusions of Law filed on July 17, 2006 (Docket # 47) that Wells Fargo Bank violated the automatic stay by failing to provide information how the postpetition mortgage payments were to be made and/or applied. Wells Fargo Bank did not have an opportunity to address this issue and it was only tangentially argued at trial in the larger context of Wells Fargo Bank's policies and procedures. Therefore, the Court did not consider this issue.

which provided the Debtors with a credit limit of $285,000.00 ("Loan").[4]

2. Pursuant to the Loan, the Debtors monthly payments are due on the twentieth (20th) of each month.[5]

3. On October 17, 2003, the Debtors executed a Deed of Trust on real property commonly known as 133 Woodchuck Court, Silverthorne, CO 80498, to secure the Loan.[6] The lender on the Deed of Trust is identified as Wells Fargo Bank with an address of:

420 Montgomery Street
San Francisco, CA 94104.

4. The Loan from *Wells Fargo Bank* refinanced a loan the Debtors had from *Wells Fargo Home Mortgage*.[7]

5. Prior to filing for Chapter 13 bankruptcy protection, the Debtors had an accountant that paid their bills, so they were not aware of the party being paid or where payments were being sent with respect to the Loan.

6. After the Debtors filed for Chapter 13 bankruptcy protection on January 3, 2006, Wells Fargo Bank discontinued sending monthly statements to the Debtors pursuant to the company's internal policy and procedure.

7. On January 11, 2006, Wells Fargo Bank filed its Proof of Claim, which contained the prepetition arrearage, and the total amount of the claim. The Proof of Claim also indicated that the name and address where notices should be sent related to this bankruptcy was:

*Wells Fargo Operation Center*
Loan Servicing Payment Processing
7412 Jefferson Blvd NE
Albuquerque, NM 87109
Telephone number 1–800–241–0039 [8]

8. On or about January 11, 2006, Wells Fargo Bank mailed a letter to the Debtors' bankruptcy counsel, Stephen Berken, which informed him that the Debtors' line of credit was no longer accessible.

9. In January 2006, Ms. Sullivan contacted *Wells Fargo Home Mortgage* in an attempt to make her payments, which were, in fact, due and owing to Wells Fargo Bank.

10. On February 22, 2006, Wells Fargo Bank mailed a letter to the Debtors' bankruptcy counsel indicating that the Debtors' Loan was due for two postpetition payments totaling $3,810.14.[9]

11. On February 23, 2006, the Debtors' bankruptcy counsel, Stephen Berken, contacted Mr. Velky at Wells Fargo Bank's bankruptcy department to inquire why the Debtors could not make payments to *Wells Fargo Home Mortgage*. This was the first contact made by the Debtors or their counsel to Wells Fargo Bank.

12. Mr. Velky informed the Debtors' bankruptcy counsel how payments were to be made to Wells Fargo Bank's bankruptcy department and the amounts owed at that time.

13. On or about February 24, 2006, Ms. Sullivan contacted Wells Fargo Bank's bankruptcy department to make her mortgage payment.

**4.** Wells Fargo Bank's Exhibit 9.

**5.** *Id.*

**6.** Wells Fargo Bank's Exhibit 10.

**7.** *Wells Fargo Home Mortgage,* according to the evidence before this Court, is a separate legal entity from Wells Fargo Bank.

**8.** Wells Fargo Bank's Exhibit 1, Debtors' Exhibit B (italics added).

**9.** Wells Fargo Bank's Exhibit 3, Debtors' Exhibit D.

14. During her February 24, 2006 conversation with Wells Fargo Bank, Ms. Sullivan was informed by a representative of Wells Fargo Bank that she was past due for her prepetition May and June 2005 payments and that any payments made would first be applied to this prepetition arrearage. The latter statement was factually incorrect and the payment was properly credited postpetition. Ms. Sullivan testified that she knew that statement to be incorrect and that she stated so to the Wells Fargo Bank representative. The payment totaled $3,810.14 and was applied post-petition to Debtors' January 20, 2006 and February 20, 2006 payments.

15. On March 1, 2006, the Debtors' bankruptcy counsel sent a letter to Wells Fargo Bank's local counsel complaining that Ms. Sullivan had been informed by Wells Fargo Bank that no payments would be accepted until Debtors' payments were brought current.[10] No evidence was provided regarding any responsive communication related to this letter.

16. On March 16, 2006, the Debtors filed their Motion to Show Cause.

17. On April 21, 2006, the Debtors' Plan was confirmed.

18. After the March 1, 2006 letter, the Debtors did not again contact Wells Fargo Bank until May 3, 2006, at which time the Debtors, through their counsel, alleged that a *Wells Fargo Bank branch office* would not accept their payments.[11]

19. In March 2006, the Debtors did not make a payment to Wells Fargo Bank because they apparently believed the payment of $3,810.14 was for February 2006 and March 2006, when in fact it was applied to the January 2006 and February 2006 arrearages.

20. In April 2006, Ms. Sullivan indicated she mailed a payment to her original lender, *Wells Fargo Home Mortgage* in Minnesota. This is a separate entity from Wells Fargo Bank and the payment was never received nor was the check cashed.

21. On or about May 16, 2006 upon the advice of her counsel, Ms. Sullivan made a payment of $1,500 to Wells Fargo Bank, by taking the payment to a *Wells Fargo Bank branch office* located in Silverthorne, Colorado. This *Wells Fargo Bank branch office* accepted the payment and credited it toward the March 2006 payment.

22. On or about May 25, 2006, Ms. Sullivan made another $1,500 payment to Wells Fargo Bank and Wells Fargo Bank credited it to the remainder of the March 2006 payment and to part of the April 2006 payment.

23. On or about May 31, 2006, Ms. Sullivan made a payment of $2,723.75 to Wells Fargo Bank which brought her loan current postpetition.

24. Ms. Sullivan made the payment on May 31, 2006 after calling Mr. Velky directly and learning the amounts outstanding. Ms. Sullivan testified that this was the first time since February 24, 2006 that she had been able to speak directly with Mr. Velky. The Wells Fargo Bank call logs admitted at trial do not show Debtors left any messages in the intervening time.

25. Ms. Sullivan did not speak to anyone at Wells Fargo Bank between February 24, 2006 and May 31, 2006, when she contacted Mr. Velky. Ms. Sullivan testified that she called several times previously but she did not leave a message. Debtors' counsel sent several letters to counsel for Wells Fargo Bank, but he was unable to resolve the confusion.

10. Debtors' Exhibit C.

11. *See* Debtors' Exhibit E.

26. Wells Fargo Bank did not send any collection notices directly to the Debtors and did not attempt to collect the debt owing by the Debtors from the date of the filing of Debtors' Chapter 13 petition through the confirmation of Debtors' Plan.

27. As of the date of the trial, Mr. Velky testified Wells Fargo Bank had not charged the Debtors any postpetition late charges or attorney's fees and has not attempted to collect the debt owing by the Debtors.

28. After the Debtors filed for Chapter 13 bankruptcy protection, Wells Fargo Bank refrained from sending any notices to the Debtors because Wells Fargo Bank's internal policies and procedures construes the sending of such notices as a violation of the automatic stay. Wells Fargo Bank apparently will send notices to Debtors after the Debtors request same in writing from Wells Fargo Bank.

29. The Court found Ms. Sullivan and Mr. Velky to be credible witnesses.

## IV. *Legal Standards*

■ The filing of a bankruptcy petition imposes the automatic stay, pursuant to 11 U.S.C. § 362 of the Bankruptcy Code. The automatic stay prohibits, *inter alia*, "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title." [12] The scope of the automatic stay is extremely broad.[13] The automatic stay re-

mains in effect until the case is closed, dismissed or discharged.[14]

■ A "willful" violation of the automatic stay permits an individual to recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, punitive damages.[15] As one commentator states: "Once the creditor becomes aware of the filing of the bankruptcy petition and therefore the automatic stay, any intentional act is 'willful.' " [16] The Honorable Elizabeth E. Brown further elaborated:

> In order for a violation to be "willful," evidence of specific intent to violate the stay is not required. Violations are "willful" if the party knew of the automatic stay and intended to take the actions that violated the stay. A party's good faith belief that it has a right to the property is not relevant to a determination of whether the act was "willful" or whether compensation must be awarded. Even an innocent stay violation (one committed without knowledge of the stay) becomes willful, if the creditor fails to remedy the violation after receiving notice of the stay. In effect, the term "willful" refers to the deliberateness of the conduct, coupled with knowledge of the filing. It does not require an intent to violate a court order. Once a court finds a violation of the stay to be willful, Section 362(h)[ [17] ] makes the award of damages for injuries mandatory.[18]

---

12. 11 U.S.C. § 362(a)(6).

13. *In re Gagliardi,* 290 B.R. 808, 814 (Bankr. D.Colo.2003)

14. 11 U.S.C. § 362(c)(2).

15. 11 U.S.C. § 362(k)(1) (this section was contained in § 362(h) of the Bankruptcy Code prior to enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA")).

16. 3 *Collier on Bankruptcy* ¶ 362.11[3], at 362–125 (Alan N. Resnick & Henry J. Sommer, eds., 15th ed. rev.2005) (citations omitted).

17. As stated *supra,* note 15, section 362(h) has been incorporated into 362(k)(1).

18. *See In re Gagliardi,* 290 B.R. at 820 (citations omitted).

However, the automatic stay does "not shield the debtor from all the vicissitudes, aggravations and anxiety of everyday life."[19] In addition to the "willful" violation the debtor must also show injury.[20] The moving party bears the burden of proof in an action for violation of the automatic stay and must prove the violation by a preponderance of the evidence.[21]

## V. *Analysis*

In the instant case, Debtors have not proven a violation of the automatic stay by a preponderance of the evidence. The parties do not dispute that Wells Fargo Bank was aware of the bankruptcy proceeding. However, none of the evidence regarding Wells Fargo Bank's representative conveying incorrect information rises to the level of a "willful" act on the part of Wells Fargo Bank.[22]

Here, Wells Fargo Bank imparted *incorrect*—that is, not false, purposefully misleading, or intentionally inaccurate—information regarding how Debtors' February 24, 2006 mortgage payment would be applied after being contacted by the Debtors themselves.[23] Wells Fargo Bank did not initiate the contact and Wells Fargo Bank made no actual effort to collect the prepetition mortgage payments other than to state the money paid on February 24, 2006 would be applied to prepetition debt. Debtors were even aware that the information regarding applying the February 24, 2006 payment to prepetition arrearages was incorrect and stated so to the Wells Fargo Bank representative. Debtors did not present any evidence that they felt threatened that Wells Fargo Bank would take immediate action to foreclose or fur-

---

19. *In re Peterson*, 297 B.R. 467, 470 (Bankr. N.C.2003).

20. *Id.*

21. This Court recognizes that there are some courts that conclude that the burden of proof is by a clear and convincing standard. The United States Bankruptcy Court for the Middle District of North Carolina made the following observations and conclusions:

> There is some difference of opinion among the courts regarding the proper standard of evidence to be used in an action to impose sanctions under § 362(h). A minority of courts have held that the proper standard is one of clear and convincing evidence. *See, e.g., Diviney v. NationsBank of Texas (In re Diviney),* 211 B.R. 951, 961 (Bankr. N.D.Okla.1997), *aff'd* 225 B.R. 762 (10th Cir.BAP1998); *Brockington v. Citizens and S. Nat'l Bank of S.C. (In re Brockington),* 129 B.R. 68, 70 (Bankr.D.S.C.1991). However, the majority of courts rely on the Supreme Court's language in *Grogan v. Garner* for the position that the preponderance of the evidence standard is more appropriate in this context. "Because the preponderance-of-the-evidence standard result in a roughly equal allocation of the risk of error between litigants, we presume that this standard is applicable in civil actions between private litigants unless 'particularly important individual interests or rights are at stake.' " *Grogan v. Garner,* 498 U.S. 279, 286, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).
> *Clayton v. King (In re Clayton),* 235 B.R. 801, 807 n. 2 (Bankr.M.D.N.C.1998); *see also,* Hon. Barry Russell, *Bankruptcy Evidence Manual,* § § 301.46 (2005).

22. *See In re Gagliardi*, 290 B.R. at 820.

23. *See In re Epperson,* 189 B.R. 195, 197 (E.D.Mo.1995) ("Courts have uniformly refused to interpret section 362(a)(6) to prohibit a *creditor* from making *any* post-bankruptcy contact with a debtor.")(emphases added); *but see, In re Draper,* 237 B.R. 502, 505 (Bankr.M.D.Fla.1999) (the court noted that several courts have held that the conduct prohibited by 11 U.S.C. § 362(a)(6) ranges from "such informal contact as telephone calls or letters to more formal contact such as judicial or administrative proceedings"). A key to this Court's ruling is that Debtor initiated the contact and Wells Fargo Bank responded to that contact.

ther pursue the prepetition arrearages.[24] None of the funds Wells Fargo Bank has received from Debtors to date has been applied to Debtors' prepetition debt. Wells Fargo Bank's representative testified that Debtors were not being charged late fees, attorney's fees, or any other fees for any untimely postpetition mortgage payments made through the date of the trial in this matter.[25]

■ The parties did not communicate effectively in determining the correct location to send Debtors' mortgage payments. This situation created an inconvenience for the Debtors, but an inconvenience does not necessarily rise to the level of or otherwise constitute an act in violation of the automatic stay.[26] Here, the blame for this "inconvenience" and frustration is shared by both parties.

On the one hand, Wells Fargo Bank's internal policies appear to severely limit *timely, effective, or efficient* communication with debtors and/or their counsel creating, in this instance, a series of administrative hurdles for Debtors to timely comply with their postpetition obligations.[27] On the other hand, Debtors'

actions did not help ameliorate the situation either. They did not follow up their February 24, 2006 contact with Wells Fargo Bank to confirm their mortgage status and/or arrange future payments even though they knew they had been provided incorrect information. This was evidenced by the lack of communication with Wells Fargo Bank between February 24, 2006 and until sometime in May 2006, and by Debtors' April 2006 payment that was incorrectly mailed to *Wells Fargo Home Mortgage.* Debtors' contention that Wells Fargo Bank violated the automatic stay by failing to provide information as to how postpetition mortgage payments were to be made would require the Court to make a business judgment for Wells Fargo Bank for which it has no jurisdiction. However, the Court could imagine circumstances where this non-volitional behavior on the part of a creditor could rise to the level of a violation of the automatic stay.[28]

Having made these findings of fact and conclusions of law with regard to this dispute and these circumstances, there is the question as to when a lender's mistakes,

**24.** *See Brown v. Pennsylvania State Employees Credit Union,* 851 F.2d 81, 86 (3rd Cir.1988) ("The respite [provided by the automatic stay] is not from communication with creditors, but from the threat of immediate action by creditors, such as a foreclosure or a lawsuit.").

**25.** *See In re Shriver,* 46 B.R. 626, 631 (Bankr. N.D.Ohio 1985) (stating "if there was no need to resort to legal action such as in this case where the defendants offered to return the debtor to the status quo there are no grounds for attorney fees.").

**26.** *See In re Peterson,* 297 B.R. at 470.

**27.** Wells Fargo Bank's contention that *any* communication with Debtors would constitute a violation of the automatic stay seems misplaced. *See In re Sherkanowski,* 2000 WL

33679425 (Bkrtcy.D.N.H.2000) (finding postpetition mortgage statements which included both postpetition payment due dates and prepetition arrearage amounts that were sent directly to debtors did not violate the automatic stay). *See also In re Epperson,* 189 B.R. 195, 197 (E.D.Mo.1995).

**28.** C.f., *Guetling v. Household Fin. Serv., Inc. (In re Guetling),* 312 B.R. 699, 704 (M.D.Fla. 2004). In *Guetling,* the Court concluded that where a creditor's internal record-keeping or changes on its part were not communicated to the Plaintiff or had an effect on the debtors' bankruptcy proceedings, it did not rise to the level of a violation of the automatic stay. Here, the error *was* communicated to the Ms. Sullivan, but the erroneous communication, based upon the evidence before this Court, does not appear to have had any effect on the debtors' bankruptcy proceeding.

miscommunication, inept loan administration, sloppy record keeping, poor internal controls and case management, or simple neglect become actionable. Where, as here, Wells Fargo Bank precipitated the confusion and miscommunication—and the obvious distress and consternation of the Debtors—it is very tempting to try and rectify the lender's neglect and its consequences. But, the Court is not, under *these* circumstances, clothed with the authority to correct simple inadequate business practices; it is only authorized to find and correct conduct which qualifies as a "willful" violation of the automatic stay.

 In addition, even if the communication of the incorrect information had constituted a "willful" violation of the automatic stay, Debtors failed to present any evidence of actual damages or harm. Debtors generically asserted at trial that Ms. Sullivan took time off work to attend the hearing before this Court. But no breakdown of actual damages was presented nor was any substantiated amount of attorney's fees presented to support a claim for damages. Debtors' Proposed Findings of Fact and Conclusions of Law (Docket # 77) recognize this and only listed $1.00 in actual damages.[29]

Debtors also requested the Court award them punitive damages. No evidence was presented that Wells Fargo Bank acted with reckless disregard.[30] Wells Fargo Bank's representative made a factually incorrect statement to Debtors on February 24, 2006. Debtors knew this information to be incorrect. Wells Fargo Bank made no subsequent contact or other efforts to collect on the prepetition debt owed by Debtors. Debtors made no effort to contact Wells Fargo Bank's bankruptcy department between February 24, 2006 and May 31, 2006 even though they were aware of the address and phone number and had made payments through that office. As such there are no grounds for awarding punitive damages.

## VI. *Conclusion and Order*

Based on the foregoing, the Court concludes that Wells Fargo Bank has not violated the automatic stay provided in 11 U.S.C. § 362(a) and Debtor's have failed to show any actual damages.

IT IS THEREFORE ORDERED that the Debtors' Motion to Show Cause (Docket # 19) is DENIED.

---

29. *See In re Peterson,* 297 B.R. at 472 (finding against the debtor because there had been no "willful" violation of the automatic stay and that because the "actual monetary cost to the debtor was minimal and was quickly remedied."). *See also In re Hutchings,* 348 B.R. 847 (Bankr.N.D.Ala. Sept.7, 2006) (finding against a debtor's complaint for violation of the automatic stay where only damages shown occurred after the violation had ceased).

30. *See In re Gagliardi,* 290 B.R. at 820.