**In re Mark TRUJILLO, Emily Trujillo, Debtors.**

**No. 11–29274 EEB.**

United States Bankruptcy Court, D. Colorado.

Sept. 27, 2012.

240

Michael Baetz, Denver, CO, for Debtors.

### ORDER ON STAY VIOLATION BY GARNISHING CREDITOR'S ATTORNEY

ELIZABETH E. BROWN, Bankruptcy Judge.

THIS MATTER comes before the Court on the Debtors' "Motion for Order to Show Cause Why Charles B. Darrah & Associates, LLC Should Not Be Held in Contempt for Violating the Automatic Stay Order," and the Response of Charles B. Darrah & Associates, LLC (the "Law Firm"). At a non-evidentiary hearing, the parties agreed to submit this matter on briefs. The Debtors complain of the Law Firm's failure to turn over Mr. Trujillo's garnished pre-petition wages that the Law Firm received post-petition. The Law Firm counters that it had no obligation to return these funds because its client held a valid garnishment lien on them. Having reviewed the briefs and applicable law, the Court concludes that the Law Firm violated both the turnover statute and the automatic stay. The more difficult question, however, is whether these chapter 7 Debtors have standing to seek sanctions attributable to the stay violation. Recently, several courts have held that only the chapter 7 trustee has standing to assert such a claim against a party who refuses to turn over funds that are property of the estate. For the reasons stated below, this Court concludes that, while the Debtors were not legally entitled to use these garnished funds, this fact bears only on the damages they may claim. It does not deprive them of standing to bring a stay violation to the attention of the Court.

### I. BACKGROUND

On August 24, 2007, Legal Collection Co. LLC (the "Creditor") obtained a judgment against Mr. Trujillo in the amount of $19,664.37 in a Colorado state court action. The Law Firm, which represented the Creditor, served a valid, continuing writ of garnishment on Mr. Trujillo's employer. On August 12, 2011, the Debtors filed their Chapter 7 petition. They immediately notified Mr. Trujillo's employer of the bankruptcy filing. Their attorney also listed the garnishment activity on the Debtors' Statement of Financial Affairs, but he neglected to include this debt in their schedules. Consequently, neither the Creditor nor the Law Firm appeared on the mailing matrix and they did not receive the initial

notice of the bankruptcy filing from either the Court or the Debtors.

Despite the fact that his employer had actual notice of the bankruptcy filing, Mr. Trujillo's employer withheld funds from his August 18, 2011 paycheck. This paycheck covered the last pre-petition pay period, ending August 11, 2011. The Law Firm received these garnished funds on August 22, 2011. That afternoon Debtors' counsel telephoned the Law Firm to demand return of the funds and termination of the continuing writ of garnishment. This was the first time that the Law Firm and its client learned of the Debtors' bankruptcy filing. In response, on August 24, 2011, the Law Firm delivered a release of the writ of garnishment to Mr. Trujillo's employer. It did not, however, return the funds garnished from the last pay period in the amount of $335.80 (the "Funds").

From August 22, 2011 until September 27, 2011, Debtors' attorney contacted the Law Firm several times, demanding the return of these Funds. At one point, one of the employees of the Law Firm asked whether the Funds were attributable to a pre-petition pay period and indicated that, if they were, then his client "may have a prior garnishment lien right" to these funds. He assumed the Debtors' attorney would get back to him with this information. When the Debtors' attorney called back, his call was directed to another employee, who indicated that she would look into the matter and return his call. When his telephone calls did not secure the release of the Funds, the Debtors' attorney filed the instant Motion, seeking to sanction the Law Firm for violating the Debtors' automatic stay.

In the meantime, the bankruptcy trustee sued the Creditor directly to recover all funds garnished from Mr. Trujillo's wages during the ninety days preceding the bankruptcy filing, aggregating over $2,000. The Creditor immediately repaid the garnished funds to the trustee, including the Funds at issue in this matter.[1] This repayment, however, has not satisfied the Debtors, who continue to seek sanctions, including attorney fees, costs, damages for emotional distress, other unspecified actual damages, and punitive damages. They are not seeking to recover damages from either the Creditor or Mr. Trujillo's employer, but only against the Law Firm.

It is unclear from the Debtors' Schedule C whether they intended to claim an exemption in the Funds. They have claimed an exemption in a bank account balance in the amount of $144, relying on the wage exemption statute, Colo.Rev.Stat. § 13–54–104(2)(a). None of their other exemptions appear to cover funds held by others. Of course, a debtor may amend his Schedule C to add an exemption and the Court was concerned that they might be planning to do so if they were to receive a return of the Funds. At oral argument, however, Debtors confirmed that the Funds represent the non-exempt portion of Mr. Trujillo's August 18, 2011 paycheck and they acknowledged the Creditor's prior garnishment lien on the Funds.[2]

Despite their acknowledgement that the Funds represent non-exempt property, the Debtors explained that they had intended to use the Funds anyway and then to repay this amount to the trustee over time.

1. Apparently, the Creditor did not assert its garnishment lien as a defense to preference liability.

2. Given the Debtors' stipulation that the Creditor holds a prior perfected garnishment lien on the Funds, the Court expresses no opinion as to whether its garnishment lien was in fact effective to reach these Funds paid post-petition.

This belief stems from a fairly common, but unsanctioned practice in this district. Debtors will sometimes spend proceeds of non-exempt property that are in their possession on the filing date or they will sometimes spend the tax refund received after the petition date that they know they are obligated to surrender to the trustee. They do so believing that they may then enter into a stipulation with their trustee to repay the debt owed to the estate over time. This practice has been the cause of some debtors losing their discharge when they found they were not able to repay the trustee as they had hoped.

## II. DISCUSSION

### A. "Property of the Estate" Includes the Garnished Funds

■ Under 11 U.S.C. § 541(a)(1)[3], the filing of a bankruptcy petition creates an estate that includes "all legal or equitable interests of the debtor in property as of the commencement of the case." In *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983), the Supreme Court held that the reach of § 541 was broad enough to include property that had been seized by a creditor prior to the petition date. *Id.* at 210–11, 103 S.Ct. 2309. In the present case as well, § 541 encompasses all of Mr. Trujillo's wages, even if a portion of them may be subject to a pre-petition garnishment lien, because Mr. Trujillo still held an interest in the garnished portion on the date of the petition.

Colorado Rule of Civil Procedure 103 provides:

If a judgment debtor objects to the initial *or a subsequent calculation of the amount of exempt earnings*, the judg-

ment debtor shall have 7 days from the receipt of the copy of the writ of garnishment *or calculation of the amount of exempt earnings for subsequent pay periods*, within which to resolve the issue of such miscalculation by agreement with the garnishee.

Colo. R. Civ. P. 103 § 6(a)(1) (emphasis added). Thus, even though a continuing garnishment was in effect, the emphasized language in this rule provides that with each paycheck to be garnished, a judgment debtor has an opportunity to object. Mr. Trujillo would have received a "subsequent calculation of the amount of exempt earnings" with his paycheck on August 18, 2011. Under state law, he still had a right to object to this garnishment within five days. Until the time has passed within which a judgment debtor may claim exemptions or otherwise lodge an objection, the garnishment is not considered final. *Nolan v. District Court*, 195 Colo. 6, 575 P.2d 9, 11 (1978). Since Mr. Trujillo had a right to object, he held an interest in the Funds on the petition date.

### B. Retention of the Garnished Funds Violated the Automatic Stay

■ Mr. Trujillo's remaining interest in the Funds fell under the protective umbrella of the automatic stay imposed by § 362(a). Among other things, the stay prevents a creditor from taking any further action to collect a prepetition debt or to enforce its lien rights, including the following provisions that are implicated by the facts of this case:

(1) the commencement or continuation, ... of a judicial, administrative, or other action or proceeding against the debtor ... to recover a claim against the debtor ...;

explicitly stated otherwise.

---

**3.** Future references to "§ " or "section" shall refer to Title 11, United States Code, unless

(2) the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case ...;

(3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;

(4) any act to create, perfect, or enforce any lien against property of the estate;

(5) any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title;

(6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case ... [.]"

11 U.S.C. § 362(a)(1)–(6).

Under this statutory framework, once a debtor informs his creditors of his bankruptcy filing, he is not required to do anything else. The automatic stay operates as its name states—"automatically"—to enjoin further collection actions for as long as the automatic stay remains in effect. At the conclusion of the typical chapter 7 case, the automatic stay is replaced by the discharge injunction set forth in § 727. The discharge injunction eliminates the debtor's personal liability for the debt owed to the creditor (unless it is a non-dischargeable debt), but it does not eliminate any lien rights that may exist.

■ A creditor holding lien rights may enforce its lien, but only after the automatic stay has terminated with respect to the property in question. The stay that applies to "property of the estate" ends automatically when the property ceases to be "property of the estate." 11 U.S.C. § 362(c)(1). Property ceases to be property of the estate when: (1) it revests in the debtor at confirmation of a plan of reorga-

nization; (2) it is abandoned by the chapter 7 trustee in compliance with § 554; and/or (3) once the property becomes exempt property. In the case of property that a debtor may exempt under § 522, the property is initially considered "property of the estate." *Owen v. Owen,* 500 U.S. 305, 308, 111 S.Ct. 1833, 114 L.Ed.2d 350 (1991). Once a debtor claims an exemption in the property, and the deadline passes for lodging an objection to the exemption, or the objection is lodged but overruled, the exemption becomes final and the property ceases to be "property of the estate." *See* 11 U.S.C. § 522(*l* ); Fed. R. Bankr.P. 4003(b)(1); *In re Brayshaw,* 912 F.2d 1255, 1256 (10th Cir.1990). It then reverts to its pre-bankruptcy status as "property of the debtor." *In re Mwangi,* 432 B.R. 812, 821 (9th Cir. BAP 2010). But the automatic stay continues to prevent any enforcement of lien rights against exempt property and other property that is no longer property of the estate until the earliest of either case closing, case dismissal, or when the debtor is granted or denied a discharge. 11 U.S.C. § 362(c)(2).

If a lien creditor believes its interests may be harmed in the interim, it may seek adequate protection for its lien rights under § 361, or it may seek relief from the automatic stay to enforce its lien rights under § 362(d). If it believes that its interests are in immediate peril, it may apply for an emergency hearing under § 362(f). Thus, the Bankruptcy Code has created a delicate balance between the rights of a debtor and the bankruptcy estate, on the one hand, and a lien creditor, on the other hand. The Code could have placed the burden on the debtor or the estate to first provide protection of the creditor's lien rights, but instead it gave the debtor and the estate automatic protection and placed the burden on the lien creditor to seek protection if its interests are threatened.

By asserting its client's lien rights in refusing to turn over the Funds, the Law Firm has upset this delicate balance. Its proper remedy was to seek protection from the bankruptcy court. Instead it continued to exercise control over the Funds in violation of the automatic stay.

### C. Retention of the Garnished Funds Also Violated the Turnover Statute

■ The Bankruptcy Code further imposes a duty on those holding property of the estate, whether it is potentially exempt property or not, to deliver the property to the trustee once a bankruptcy case has been commenced. Section 542(a) provides in pertinent part that:

> [A]n entity . . . in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

11 U.S.C. § 542(a).

■ Under this statute, the Law Firm had an obligation to immediately turn the Funds over to the trustee. The statute contains an exception for a creditor with set off rights, but it does not except from coverage all lien creditors.[4] 11 U.S.C. § 542(b). Nor does it condition the obligation to turn over estate property on a lien creditor first receiving adequate protection for its interest.

In *In re Jackson*, 251 B.R. 597 (Bankr. D.Utah 2000), the court held that a creditor with lien rights on the debtor's vehicle, validly repossessed pre-petition, had the obligation to deliver the vehicle to the chapter 13 debtor once the debtor filed for bankruptcy protection. *Id.* at 601. The creditor attempted to justify its refusal to turn over the car on the basis that its interest in the vehicle was not adequately protected. The debtor had not obtained insurance on the car nor offered adequate protection payments. The court rejected this justification and sanctioned the creditor for the stay violation:

> A creditor's duty to return a vehicle repossessed prepetition is not dependent on the receipt of adequate protection or proof of insurance. Because a creditor has immediate access to court pursuant to § 362(f) and § 363(e) in order to assure that adequate protection is provided, there is no reason for the creditor to delay in the turnover of estate property. This interpretation of § 542 is consistent with *Whiting Pools* . . . which places the burden of seeking adequate protection on the creditor . . . .

*Id.* at 600 (citations omitted); *see also In re Yates*, 332 B.R. 1, 5–6 (10th Cir. BAP 2005) (secured creditor's post-petition retention of vehicle repossessed pre-petition amounts to willful violation of the stay).

The Court recognizes that the delivery of a car is different from the delivery of funds. The returned car will clearly remain subject to the creditor's lien. Funds, on the other hand, are too easily spent or commingled. If the Creditor in this case feared the loss of its lien rights, it had the

---

**4.** The Court recognizes that in *Citizens Bank v. Strumpf*, 516 U.S. 16, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995), the Supreme Court held that a bank did not violate the automatic stay by freezing a debtor's bank account temporarily until its motion for relief from stay could be determined by the court. *Id.* at 21, 116 S.Ct. 286. The Supreme Court acknowledged that § 542(a) expressly recognizes an exception to a third party's turnover obligation when the creditor has set off rights. *Id.* The reasoning of *Strumpf*, however, does not protect the Law Firm because the Creditor did not have set off rights.

right to seek an emergency hearing under § 362(f). It also had the protection of § 363(c)(2), which would have prevented the trustee from using the Funds without either the Creditor's consent or an order from this Court, either of which would likely have required adequate protection of any lien rights. The Court recognizes, however, that any creditor would be hesitant to incur attorney fees to protect its lien when the amount in controversy is only $300. But the principles at play here are significant for many cases and the Court must be consistent in its ruling whether the amount in controversy is $300 or $3,000,000.

Finally, the Court acknowledges that the *Jackson* case is distinguishable from the present case in another, and very important, respect. It involved a chapter 13 proceeding. In a chapter 13 case, the debtor holds the rights and powers of a trustee specified in § 363. *See* 11 U.S.C. § 1303. In a chapter 13 case, creditors and others holding either property of the estate or potentially exempt property must deliver the property to the debtor under § 542(a), as required in the *Jackson* case. *See In re Jackson*, 251 B.R. at 600. In a chapter 7 case such as this one, however, the property must be delivered *to the trustee* rather than the debtor. Thus, the Law Firm need not have worried about whether Debtors would have spent the Funds, because its obligation under § 542(a) was to deliver the Funds to the trustee.

■ The fact that § 542(a) requires turnover *to the trustee* in a chapter 7 case is also significant for another reason. It means that the Debtors in this case have no standing to assert a right of turnover under § 542(a). Nor are they able to assert damages attributable to a violation of the turnover statute.

## D. The Debtors' Standing to Assert a Stay Violation

■ The fact that these chapter 7 Debtors have no standing to assert a violation of the turnover statute, as discussed in the prior section, does not necessarily mean they have no standing to assert the stay violation claim. The Law Firm has challenged the Debtors' standing to seek sanctions against it based on a stay violation claim. A number of thoughtful decisions have recently ruled that a chapter 7 debtor does not have standing to assert a stay violation based on actions affecting property of the estate unless and until his exemption rights in the property have been finalized. *See, e.g., In re Jimenez*, 406 B.R. 935, 942–45 (D.N.M.2008); *Bucchino v. Wells Fargo Bank, N.A. (In re Bucchino)*, 439 B.R. 761, 767–74 (Bankr.D.N.M.2010), *aff'd*, No. CV 10–177 BB/CG (D.N.M. Sept 14, 2011); *In re Lee*, 2011 WL 5452830, at *2 (Bankr.D.Alaska 2011); *In re Young*, 439 B.R. 211, 217–19 (Bankr.M.D.Fla. 2010). For ease of reference, the Court will refer to these decisions (all of which involve a debtor's bank account at Wells Fargo Bank), and others like them, as the "Wells Fargo cases."

In these cases, Wells Fargo had frozen a chapter 7 debtor's bank account on the petition date and sent a letter to the trustee offering to transfer the funds to the trustee upon request. Wells Fargo was not a creditor and held no setoff rights. Under these circumstances, the courts found that the freeze did not constitute a violation of the automatic stay. The courts ruled further that the chapter 7 debtors had no standing to raise a stay violation claim. It is this alternative ruling that the Court questions. The Wells Fargo cases based their analysis of standing primarily on the fact that a debtor does not have more than an inchoate interest in potentially exempt funds at the out-

set of a chapter 7 filing. *E.g., In re Jimenez*, 406 B.R. at 945 (concluding debtor did not have standing to pursue an alleged stay violation despite her claim of exemption because, at the time the bank froze the accounts, the time for objecting to exemptions had not yet expired and the accounts were property of the estate). Not all courts agree that the inchoate nature of the exemption deprives a chapter 7 debtor of standing. *See In re Mwangi*, 432 B.R. 812, 822 (9th Cir. BAP 2010) ("Section 522's right to claim exemptions in property of the estate bestows standing on debtors for purposes of § 362(k)(1).").[5]

Following the lead of the Wells Fargo cases, the Tenth Circuit Bankruptcy Appellate Panel recently extended this holding beyond the context of a bank account balance in the case of *In re Cook*, 2012 WL 1356490 (10th Cir. BAP April 19, 2012). In *Cook*, the debtor filed a motion against Wells Fargo for stay violations based on, among other things, its post-petition advancement of state court litigation to obtain the right to foreclose against intellectual property rights, in which the debtor had claimed an exemption. The bankruptcy court had previously annulled the stay to allow these state court actions to stand and, therefore, it held that Wells Fargo had not violated the stay. *Id.* at *3. The bankruptcy court further held that the debtor lacked standing to bring the stay violation motion because such actions can only be asserted by the trustee. *Id.* On appeal, in an unpublished decision, the Panel based its ruling on this question of standing. It recognized a split of authority of exists, but held:

> We find the line of cases that hold a mere claim of exemption does not confer standing more persuasive. The purpose of the automatic stay is to protect debtors, but it also protects the estate and allows for the liquidation to proceed in an orderly manner.... And it is the Trustee who has the right to use property of the estate. A Chapter 7 debtor has none of these rights.... Unilateral intervention by a party in interest, however laudable that party's motivation, may conflict with a trustee's strategy and result in a smaller, rather than a larger, recovery. An unauthorized plaintiff may disclaim any duty to protect the interests of the estate. The court and the trustee would lack the degree of control over a volunteer plaintiff necessary to insure that the duty being assumed is faithfully and competently performed. In short, a bankruptcy estate, like a ship, can have but one captain.

*Id.* at *8–9 (footnotes omitted).

This decision and the Wells Fargo cases rest on four major assumptions: (1) a chapter 7 debtor has no right to use property of the estate until his exemptions have become fixed; (2) if the debtor cannot use the property, then he has no injury; (3) standing to assert a stay violation is exclusive, in that only one person may possess the requisite standing; and (4) while the property remains property of the estate, the chapter 7 trustee is the party with standing because he is the representative of the estate. Resolution of this thorny question of standing requires this Court to test each of these underpinnings.

### 1. Chapter 7 Debtor's Right to Use Property of the Estate: the Concept of "Surrender"

The Wells Fargo cases assume that a chapter 7 debtor has no right to use prop-

---

5. The standing issues raised in the *Mwangi* case are currently before the Ninth Circuit in a separate but related appeal. *Mwangi v. Wells Fargo Bank, N.A. (In re Mwangi)*, No. 12–16087 (9th Cir. May 8, 2012).

erty of the estate, unless and until the property reverts to him as exempt property. This assumption appears to be tied to the factual context of these cases insofar as they involve a debtor's bank account balance. No court wants to see a debtor dissipate the funds in his account before his exemption has ripened. Once the cash is gone, it may never be replaced. If all or a portion of the funds turn out not to be exempt, and the debtor is not able to replace them, he may lose his discharge. But the principles at play here must be viewed beyond this narrow factual context.

■ In reality, chapter 7 debtors continue to use property of the estate post-petition. The debtor continues to live in his home, cook his food in his pots and pans, wear his clothing, drive his car, and watch programs on his expensive flat screen television. Is this post-petition use prohibited? Section 521(a)(4) sets forth a chapter 7 debtor's obligation in regard to property of the estate at the outset of a case. It requires a debtor to surrender to the trustee all property of the estate and any records whenever a trustee is serving in the case. 11 U.S.C. § 521(a)(4). Does this mean that, at the outset of every chapter 7 case, the debtor must hire a truck to transport all of his belongings, his pots and pans and all of his clothing included, and drive them to the trustee's office? And then once his exemptions have ripened, does he hire the truck again and go fetch his belongings back? The answer is found in § 521(a)(4)'s use of the term "surrender." By way of contrast, the turnover statute, § 542, uses the term "deliver." With very limited exceptions, § 542(a) requires anyone holding property of the estate to "deliver" the property to the trustee at the outset of the case. A chapter 7 debtor's obligation under § 521 is to "surrender" the property. If we are to assume that Congress chose to use different words deliberately, as we must, then the debtor's surrender obligation connotes something different than actual delivery.

The terms "surrender" and "surrendered" are used in several places in the Bankruptcy Code.[6] In some bankruptcy statutes, the duty of surrender that is described is not the duty to surrender to the trustee, but the duty to surrender collateral to a secured creditor or to surrender leased property or premises to the lessor. Regardless of the context, the Bankruptcy Code has not defined its use of this term. Nor does it "tell us what (if anything) the debtor [or trustee] must do to accomplish a surrender...." *In re Gaston*, 2011 WL 1434758, at *3 (Bankr.D.Hawai'i April 14, 2011). "Since Congress did not use the term 'deliver,' however, one reasonably may assume that 'surrender' does not necessarily contemplate that the debtor physically have transferred the [assets]." *In re Pratt*, 462 F.3d 14, 18 (1st Cir.2006). Obviously, some property, such as real estate, cannot be physically delivered. Thus, "the most sensible connotation of 'surrender' ... is that the debtor agreed to make the [asset] *available*...." *Id.* at 18–19 (emphasis original). Black's Law Dictionary defines "surrender" as "[t]he act of yielding to another's power or control." Black's Law Dictionary 1581 (9th ed. 2009). One court has explained the difference between the Code's use of "abandonment" and "surrender" as "surrender of collateral requires a mutual agreement between parties." *In re Service*, 155 B.R. 512, 514 (Bankr.E.D.Mo.1993) (citing *In re Robertson*, 72 B.R. 2, 4 (Bankr.D.Colo.1985)).

---

**6.** *See* 11 U.S.C. §§ 362(h)(1)(A); 365(d)(4)(A); 502(b)(6)(A)(ii); 521(a)(2)(A); 521(a)(4); 727(d)(2); 1110(a)(3)(B); 1110(c)(1),(2); 1143; 1168(a)(2)(B), (c)(1), (c)(2); 1225(a)(5)(C); and 1325(a)(5)(C).

■ Thus, in the context of § 521(a)(4), the duty of surrender implies a yielding or offering of property of the estate to the trustee, in recognition of his superior rights, as well as a ready willingness to deliver it, either physically or in whatever manner is necessary to transfer rights in the type of property interest at issue. This further "delivery" obligation, however, is triggered by a request or an agreement with the trustee to effectuate the transfer of the property. On the petition date, legal title to assets of the estate vests in the trustee immediately by operation of law, but actual transfer or delivery may not take place for some period of time. In the case of property that eventually becomes exempt or that is burdensome or of inconsequential value to the estate, the transfer or delivery may never take place. On the other hand, if the trustee makes a request for delivery and the debtor fails to comply, then the trustee may utilize § 542(a) to obtain a court order for turnover, as the debtor is included within the scope of the Code's definition of an "entity" that may be compelled to turnover property. 11 U.S.C. §§ 542(a), 101(15).

■ Unless and until, however, a debtor has received the request for delivery, he has fulfilled his obligation to surrender his property to the trustee by listing it accurately, as required by § 521(a)(1), and standing ready to deliver it upon request. If his continued use or possession in the meantime diminishes its value or the estate's rights in and to it, then he may be liable to compensate the estate for its "value." 11 U.S.C. § 542(a). Although his possessory interest may be fleeting and require him to compensate the estate, the concept of surrender contemplates the continued use of the property by a chapter 7 debtor for some period of time, except in the case of "cash collateral," as noted below.

## 2. When Property of the Estate is "Cash Collateral"

■ While debtors generally continue to use property of the estate for some period of time, the Bankruptcy Code contains an absolute prohibition against the use of one form of property of the estate known as "cash collateral." Whenever we think of "cash collateral," we generally think of the traditional situation in which a lender has acquired a security interest in the debtor's property, including proceeds of that property, which in turn includes any cash and cash equivalents that represent proceeds of the collateral. The definition of cash collateral in the Bankruptcy Code, however, is not limited to situations in which the debtor has voluntarily granted a security interest. It defines cash collateral as:

> cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided by section 552(b) of this title, whether existing before or after the commencement of a case under this title.

11 U.S.C. § 363(a). This subsection may be broken down into five elements: (1) cash and cash equivalents; (2) whenever acquired—whether before or after the commencement of a case; (3) in which the estate and an entity other than the estate have an interest; (4) including the proceeds, products, offspring, rents, or profits of property; and (5) including "fees, charges, accounts or other payments" at-

tributable to the occupancy of lodging properties. The fifth element of this subsection is limited to security interests, but the general description in the first three elements is not limited to consensual liens. The general language of the statute includes all entities that have an "interest" in the cash collateral. In this general language, Congress used the broader term "interest," rather than the narrower term "security interest."

 Thus, a creditor who acquires a judicial lien, statutory lien, or execution lien, such as a garnishment lien, will be afforded the same protections as creditors holding a consensual lien on cash collateral. *See generally In re Polly,* 2008 WL 5786899, at *4 (Bankr.E.D.Va. Nov. 14, 2008) (finding garnished funds fall within the definition of cash collateral, but because the creditor's lien was clearly avoidable, no adequate protection required); *Vescovo v. First State Bank (In re Vescovo),* 125 B.R. 468, 473 (Bankr.W.D.Tex. 1990) (finding cash deposited in court registry which was subject to judgment lien amounted to cash collateral of the judgment creditor). Consequently, the Creditor in this case holds an interest in the Funds and the Funds fit within this definition of cash collateral.

 Accordingly, the Debtors were not permitted to use the Funds. Specifically, § 363(c)(2) provides that:

> The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless—
>
> (A) each entity that has an interest in such cash collateral consents; or
>
> (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2). This prohibition is both absolute and automatic. It is not triggered by a creditor's prior request to prohibit the use of cash collateral. It does not even require the creditor to file a notice asserting its lien rights in the bankruptcy case. The prohibition springs into being by operation of law. Unless and until the Creditor consents to the use of the Funds, or this Court enters an order permitting their use, they are not available for use.

 It is important to note that this statute not only prohibits the Debtors' use of the Funds, but it prohibits the trustee's use as well. Cash collateral is, therefore, not available to anyone until the statute's requirements have been satisfied. Does it follow then that, because no one has the right to use cash collateral, there can be no violation of the stay by a creditor that exercises control over cash collateral? May a creditor act with impunity because no one has standing to assert a stay violation in this context?

### 3. Stay Violations Injure More than Pecuniary Interests: The Test for "Standing"

 No one would deny that a trustee has standing to assert a stay violation against a third party who refuses to turn over, and exercises control over cash collateral, despite the fact that the trustee's own use may be prohibited. Cash collateral is not the only property of the estate that carries restrictions on its use by a trustee. Absent court authority, a trustee may not use other property of the estate when his use is "other than in the ordinary course of business." 11 U.S.C. § 363(b)(1). Consequently, any test for standing to assert a stay violation based on actions taken against property of the estate cannot be tethered to an unfettered right to use the property.

 In search of a proper test for standing, the Court must begin with the

"Article III constitutional standing requirement [that] applies in bankruptcy court, even though the bankruptcy court is an Article I court." *In re Bucchino,* 439 B.R. 761, 770 n. 10 (Bankr.D.N.M.2010), *aff'd,* No. CV 10–177 BB/CG (D.N.M. Sept 14, 2011). As the *Bucchino* court stated well:

> [t]he "case" or "controversy" requirement of Article III of the Constitution requires that for the Plaintiffs to have standing they must allege: 1) an injury in fact (*i.e.,* a concrete and particularized invasion of a legally protected interest that is actual or imminent and not merely conjectural or hypothetical); 2) a "fairly traceable" connection between the alleged injury and the alleged conduct of Defendant; and 3) that it is likely (and not merely speculative) that the alleged injury will be redressed by the relief the Plaintiffs seek.

*Id.* at 768 (footnotes omitted). As the *Bucchino* court recognized, "[t]he legally protected interest need not necessarily be an economic interest." *Id.* at 768–69 (footnote omitted). Thus, while the injury may not be merely conjectural or hypothetical, it need not involve a direct pecuniary loss. The type of "injury" sufficient to confer standing must be tied to the interests that the law seeks to protect.

The interests that the automatic stay seeks to protect are reflected in that statute's legislative history, which acknowledges two fundamental goals of the automatic stay. The first goal is a benefit provided to the debtor:

> The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors. It stops all collection efforts, all harassment, and all foreclosure actions. It permits the debtor to attempt a repayment or reorganization plan, or simply

to be relieved of the financial pressures that drove him into bankruptcy.

H.R.Rep. No. 95–595, at 340 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6296–97 (capitalization altered). The second is a protection given to creditors generally:

> The automatic stay also provides creditor protection. Without it, certain creditors would be able to pursue their own remedies against the debtor's property. Those who acted first would obtain payment of the claims in preference to and to the detriment of other creditors. Bankruptcy is designed to provide an orderly liquidation procedure under which all creditors are treated equally. A race of diligence by creditors for the debtor's assets prevents that.

*Id.* Neither of these goals necessarily involves a loss in value to the estate. When one creditor is paid to the detriment of another creditor, it does not cause a loss to the estate generally. Likewise, the temporary "breathing spell" has no impact on the estate. It may only involve the debtor's peace of mind, an injury that is difficult to quantify in dollars and cents. Yet this legislative history evidences Congressional intent to foster a debtor's breathing space and the equal treatment of like creditors. If a violation of the automatic stay causes an injury to either a particular creditor or to a debtor's breathing spell, that injury should be sufficient to confer standing.

In fact, the language of the statute itself conveys this broader view of standing by Congress' use of the term "individual" in § 362(k):

> Except as provided in paragraph (2), an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages.

11 U.S.C. § 362(k). Congress chose to provide a cause of action to any "individual" injured by the violation. It could have used the term "trustee." Use of "trustee" would have also conferred standing on a chapter 13 or chapter 11 debtor, but denied standing to a chapter 7 debtor, creditor, or any other party in interest. "The term 'individual' is not defined by the Bankruptcy Code, but it is used throughout the Code to refer to debtors and non-debtors." *St. Paul Fire & Marine Ins. Co. v. Labuzan,* 579 F.3d 533, 539–40 (5th Cir.2009). Other courts have recognized a creditor may also be an "individual" with standing to assert a stay violation claim. *Id.* at 543; *Homer Nat'l Bank v. Namie,* 96 B.R. 652, 655 (W.D.La.1989). "Individual" is broad enough to encompass debtors, creditors, trustees, and other parties in interest. The test for standing, therefore, should be tethered only to the type of legal interests intended to be protected by the automatic stay. As long as those interests have been injured, any individual harmed by the violation has standing to assert a claim.

■ Thus, in the context of stay violations, standing is not exclusive. A specific stay violation might cause injury to a debtor, the estate, and a particular creditor. There is no reason why all three parties could not assert damages for the stay violation. The court will merely apportion the damages to each according to the injury suffered by each. "It is possible for a bankruptcy estate and a creditor to own separate claims against a third party arising out of the same general series of events and broad course of conduct.... There is nothing illogical or contradictory about saying that [the stay violator] might have inflicted direct injuries on both the [creditor] and [the debtor] during the course of dealings that form the backdrop of both sets of claims." *Labuzan,* 579 F.3d

at 545 (internal quotes and citations omitted).

Does this broader view of standing violate the basic tenet that claims held by the estate must be brought by the estate's representative? In other words, does this expanded definition of standing violate the principle that every ship has but one captain? The reason it does not is because a claim arising from a stay violation is not "property of the estate." Section 541(a)(1) provides that property of the estate includes "all legal or equitable interests of the debtor in property *as of the commencement of the case.*" 11 U.S.C. § 541(a) (emphasis added). "[A] § 362(k) claim can never be brought as of the *commencement* of the case because, by definition, an automatic-stay violation occurs *post-*filing." *Labuzan,* 579 F.3d at 545 (emphasis original). Nor is it an "interest in property that the trustee recovers under section 329(b), 363(n), 543, 550, 553, or 723 of this title." 11 U.S.C. § 541(a)(3). Thus, a stay violation claim is not the same as a contract claim held by the debtor on the date of filing, nor is it like a fraudulent conveyance claim, a preference claim, an alter ego claim, or any other claim that may be brought by the estate's representative on behalf of creditors generally. It is a private right of action expressly provided by Congress to any individual injured by the stay violation. To the extent that the estate is injured, a trustee serving in the case may pursue a remedy, but so may the debtor or creditor whose legally protected interests are harmed by the violation.

If this Court were to follow the Wells Fargo line of cases that hold that a chapter 7 debtor has no right to use property of the estate and, therefore, has no injury to confer standing, consider the application of this rule to a typical case in which the debtor owns his home, subject to encumbrances that exceed its value. Assume

that a lien holder willfully proceeds with the foreclosure action post-petition, despite actual knowledge of the debtor's bankruptcy filing. In this example, the chapter 7 trustee may not even be aware of the stay violation before the foreclosure sale has occurred. Certainly, the trustee will have little or no incentive to pursue a stay violation against the offending creditor. The estate will suffer no damages attributable to the violation because it would realize no value from this fully encumbered asset. Under a very narrow interpretation of "injury," one could claim that the debtor has no "injury" because, until his exemption ripens, he has no rights in his home. But few courts would refuse to allow the chapter 7 debtor to bring this matter to the court's attention. To hold otherwise and to adopt an overly narrow view of standing would serve only to encourage creditors to violate the stay with impunity. In this example, the debtor has been robbed of his temporary "breathing spell," an interest that Congress has declared to be one of the most fundamental purposes of the bankruptcy laws. This interest alone is sufficient to vest the chapter 7 debtor with standing.

Admittedly, the facts in the present case are much less sympathetic than this example involving a debtor's home. No one disputes that the Funds were property of the estate. Both sides agree that the Funds would not become exempt property with the passage of time. As cash collateral, it is clear that the Debtors had no right to use these Funds. But despite the lack of any claim to their use, the Debtors were entitled to enjoy the temporary breathing space provided by the automatic stay to be free from the efforts of creditors to dismantle their assets or to bring pressure to bear on them. They should not have had to hire an attorney to make repeated telephone calls and to file a motion with this Court.

### E. Damages for Violation of the Stay

■ Thus, the right to use property is not the only interest protected by the automatic stay. But whether a debtor has the right to use the property is relevant to the issue of his damages. A court must award damages to an "individual injured by any willful violation of a stay. . . ." 11 U.S.C. § 362(k). This presumes a causal connection between the injury and the stay violation. If a debtor is not entitled to the use or possession of an asset, then many of the debtor's claimed injuries may not be attributable to the creditor's violation. In this case, the Debtors admitted during oral argument that the Funds represented the non-exempt portion of his wages and that the Creditor had a pre-petition garnishment lien on them. As a result, there is no causal connection between the Law Firm's actions and the Debtors' inability to use these Funds.

■ The actions of the Law Firm did, however, interfere with the Debtors' temporary breathing spell. While this is a compensable injury, the Debtors chose to submit this matter to the Court on briefs and have not offered any evidence of emotional distress or other compensable damages. The Debtors bear the burden of proving damages with reasonable certainty. As this Court has previously ruled, "[f]leeting and unsubstantiated emotional distress is not compensable." *In re Gagliardi*, 290 B.R. 808, 819 (Bankr.D.Colo. 2003). Without any evidence, the Court also cannot make a determination as to whether punitive damages are appropriate.

■ Does this mean that the Law Firm bears no liability for its willful violation of the statute? The Debtors have suffered one injury attributable to the Law Firm's refusal to return the Funds. They

have incurred legal fees in bringing the Motion that is before this Court. These fees should be limited, however, to those incurred before the Creditor returned the Funds to the trustee in connection with the preference litigation.

## III. CONCLUSION

Based on the foregoing, the Court holds that the Law Firm violated § 362(a). The conduct was willful as that term is used in § 362(k). *See In re Gagliardi*, 290 B.R. at 818–19. The Court will grant Debtors an award of fees to the extent limited herein. The Debtors shall submit an affidavit of fees within fourteen days of the date of this Order. If the Law Firm wants to comment on the fees submitted, it must do so within fourteen days from the submission of the affidavit. In this matter, the Court will delay the entry of judgment on this Order until it has entered an Order on the fees as well.